Final case of the day, which is Herederos v. Teck Resources, 21-12834. I show Mr. Herzl here for the appellant, Mr. Sills here for the appellee. Mr. Herzl whenever you're ready. Thank you, Your Honor. May it please the court, Leon Herzl, also at council table is Andre Dreyfus and Pedro Gomez, second row to Your Honor's left. Your Honor, this case deals with the Helms-Burton Act, which is a statute that expressly authorizes the district courts to exercise jurisdiction over foreigners who are trafficking in property that was confiscated by the Cuban government after 1959. There's not a single case where a court has applied the minimum contacts analysis under the Fifth Amendment due process when the case deals with a statute that regulates extraterritorial conduct. This court, Judge Newsome, this is your opinion in the United States v. Napa case from 2020. You expressly found in that case that the minimum contacts analysis does not apply to the due process test under the Fifth Amendment when you're does not apply here. What does apply is the not arbitrary or fundamentally unfair analysis, which is essentially whether or not the defendant was on notice that he or she or it could be hauled into court in the United States. And in most cases, U.S. v. Napa, U.S. v. Noel, both 11th Circuit cases and also Supreme Court cases of Keogh Bell, Morrison, and RJR Nabisco, there's the two-step process and the second step of the analysis on the not arbitrary or fundamentally unfair. The courts look to whether or not the statute in question is internationally recognized as a crime by most law-abiding countries dealing with narcotics trafficking, dealing with the Sherman Act, etc. And in this case, trafficking and stolen property is a claim that is internationally recognized as something that's inappropriate. So for that reason, the defendant, in this case, Tech, was on notice because this is the type of crime that is internationally recognized. In addition of that, they are on notice because the statute in the congressional record, they're named in the congressional record personally as a company that is trafficking and confiscated property. They started- Can I ask you a question just so we get too far down into the weeds, just about the sort of the superstructure of the analysis that's required? You mentioned Napa. Napa, of course, is an unpublished opinion. What do you do with cases like Oldfield that seem to equate the jurisdictional analysis under the Fifth Amendment with the jurisdictional analysis under the Fourteenth Amendment? Your Honor, all of those cases, including Daimler, including Keogh Bell, Morrison, RJR Nabisco, all of those cases deal with a situation where there's not a federal statute that regulates extraterritorially. The cases are clear that when there's a federal statute at play that regulates extraterritorially, the minimum contacts analysis does not apply. And what you apply is the not arbitrary or fundamentally unfair analysis. So the not arbitrary or fundamentally unfair standard, that applies- Not only to statutes that deal with extraterritorial regulation, but also the exercise of court jurisdiction pursuant to those statutes. Because those might be two different things, right? I mean, you might say, well, when can Congress regulate extraterritorially? Well, it can regulate extraterritorially when it's not fundamentally unfair or arbitrary for it to under that statute. Now, I'm not sure if there are good reasons to treat those. There might be good reasons to treat them the same. There might be good reasons to treat them differently. But at least arguably, those are two different questions, right? Yes, Your Honor. And the answer to the first question is whether or not Congress's regulation of extraterritorial conduct falls within a recognized international law principle. And what we have here are two recognized international law principles. One is that the conduct that they're regulating has a substantial effect within the United States. And in those cases, Congress is able to regulate foreign conduct. And in the Helms-Burton Act, it's found that trafficking in property that was confiscated by the Cuban government is a national security concern. It's also a U.S. foreign policy issue. And thirdly, under the effects test, which is an internationally recognized principle, Congress has a right to regulate when the conduct has a substantial effect in the United States and on United States nationals. And that's why this law is somewhat limited in scope, where only U.S. nationals that have claims to confiscated property that's been trafficked in are able to bring a Helms-Burton Act claim. And then the second part of the question is, if Congress has the right to regulate... And before you get to that, if I can follow up on a question my colleague asked you. We've hinted at, run up to the water's edge, but never quite bitten down and said the 14th Amendment analysis applies in the Fifth Amendment. Most other courts have done that, or at least a bunch of other circuits have done that. We say in old field the following as the language and policy considerations of the Due Process Clause of the Fifth and Fourteenth Amendments are virtually identical. Decisions interpreting the Fourteenth Amendment's due process guide us in determining what due process requires in the Fifth Amendment jurisdictional context. We say things like that in BCCI, although we don't just take everything in column A and move it into column B. Why shouldn't we actually do that in this case and say that the Fourteenth Amendment due process analysis applies and is adopted for these purposes with regard to the Fifth Amendment? What am I pretty, pretty close? The interests are virtually identical. It doesn't necessarily dispose of your argument, but I'm at a loss to understand why we ought not to adopt the Fourteenth Amendment analysis and apply it in the Fifth Amendment context. The endgame of the analysis is whether or not the defendant had fair warning to be able to be hauled into court here. And the minimum context test is the traditional way that the courts find that the defendant has fair warning to be hauled into court. The Supreme Court in Jay McIntyre machinery versus Nicastro, they left open the possibility of there being a different analysis under the Fifth Amendment due process. The cases that do talk about the Fourteenth Amendment guiding the analysis under the Fifth Amendment, that is the case in most federal court actions that are based on either common law claims or based on federal statutes that do not have an extraterritorial reach. The Supreme Court analyzed this in Keogh Bell, in Morrison, which are both dealing with the alien tort statute, and in RJR Nabisco, which dealt with the federal RICO claim. And they found in those cases that the statutes do not have an extraterritorial reach and thus applied the minimum context analysis. And this court has found in the U.S. versus Napa case expressly that the minimum context analysis do not apply when you're dealing with a statute that regulates extraterritorially. What needs to be found in those cases is that it's not arbitrary or fundamentally unfair, which gets you to fair warning. You have fair warning if you're violating a law that's internationally recognized. Why? Because it's a violation of law in most places in the world, so you should anticipate being hauled into court here. But this case is even simpler, because tech was on notice. It started trafficking in 1994. The Helms-Burton Act was passed in 1996. They were warned. They were named in the congressional record. The Helms-Burton Act was published in the Federal Register. President Clinton made an announcement to the world, specifically putting all the traffickers on notice that you have a three-month grace period to wind down your operations and stop trafficking and confiscated property, or you're subject to jurisdiction in the United States. And Congress specifically authorized the district courts to hear cases under the Helms-Burton Act when foreigners are trafficking. So there's no question here that tech was on notice, that it was subject to being hauled into court in the United States when it continued trafficking for years after the Helms-Burton Act was passed. And according to our estimates, took over $100 million of minerals from our clients' mines in Cuba. When they did that, knowing that the Helms-Burton Act was passed and they continued to traffic, there's no question that they knew. And there's also no question that dealing in confiscated property is a crime. It's internationally recognized as a crime. And for those reasons, it's fundamentally fair that they were on notice and they should be able to be hauled into court here. There's also some issues relating to standing and to whether or not the cause of action was properly pled. I see that I have 10 seconds left, so I'll address those in rebuttal. Very well. All right, Mr. Sills, you're up for 15. Good morning, Your Honors. May it please the Court. I'm Robert Sills on behalf of the Appley Tech Resources along with my colleague Jennifer Altman. I think the presentation we just heard, Your Honors, conflates two different issues. It conflates the power to regulate conduct outside the United States, in particular, the criminal extraterritorial jurisdiction of the United States, as in the Napa case, with the power to adjudicate, which has always been subject to the ordinary tests for the exercise of personal jurisdiction. What about the fact that some of those, I agree with you, hence my question earlier, that there is this distinction between regulation and fairness? What about the fact that some of the regulation cases use sort of like buzz language from jurisdiction land, like being hailed into court and minimum contacts and stuff like that? Because the fairness analysis, which underlies both, in other words, is it right to regulate conduct outside the United States, Your Honor, can turn or could look to conduct like that. Because Congress seldom, if ever, has gone to the limits of its power to regulate conduct overseas. But the fact that conduct outside the borders of the United States can be regulated doesn't mean that a foreign defendant can be brought, on their analysis, to any state in the United States because of the extraterritorial regulation of conduct. They're two distinct legal issues. Both have to be satisfied. And I will note, with regard to the repeated references we just heard about how the Helms-Burton Act embodies a well-accepted principle of international law, that's simply not true. As the Court is well aware, there was a storm of criticism from other countries about this. And Canada, the home jurisdiction of tech, as well as the entire European Union, passed blocking statutes aimed specifically at the Helms-Burton Act. But that really is, I think, an appeal to emotion as opposed to an appeal to law. As Judge Marcus's questions brought out, every circuit that has passed on this issue has held that because the language is the same between the Fifth and Fourteenth Amendment due process clauses, and because the goals are the same. And the goals are not, as the briefing in this case suggested, because of federalism concerns. Those are certainly part of the international shoe analysis. But more important is the fairness question. Can a defendant be, as you mentioned, Judge Newsom, hauled into court, held into court? And it is the due process right not to be sued where one is not subject to jurisdiction. And that's important here. The Waldman case in the Second Circuit, the Carrier Corporation case in the Sixth Circuit, I'm sure I'm going to mispronounce this, the Abdul-Ez case in the Seventh Circuit, and the Duprental Animal Health case in the Federal Circuit, all held explicitly that the Fifth and Fourteenth Amendment tests for personal jurisdiction are the same, because they serve the same policy goals. And there is, I think, a very compelling analysis of that exact question in the Livnot case in the D.C. Circuit, which analyzed the arguments for and against and concluded, in an elaborate reported opinion, that the standards are the same. And as the questions from the bench to my colleague reflected just a little while ago, this Court has come very close to ruling that. Ruling that in the Oldfield case, which in turn relied on the BCCI case, and in an unreported case called Schulman versus Institute for Shipboard Education, expressly held that the two standards were the same. And Daimler itself, although it tested California jurisdiction, because that was the way in which the case had been framed, arose under two federal statutes providing for extraterritorial jurisdiction, the Alien Tort Statute and the Torture Victims Protection Act. So following the logic of the plaintiff's position, having lost in Daimler, and it having been determined that there was no state court of general jurisdiction that could exercise jurisdiction over Daimler with respect to these claims, the plaintiffs there could have simply turned around, invoked Rule 4K2, and immediately gone forward invoking the pre-Daimler standard of general jurisdiction, which is what they contend for here. But Daimler states a general rule of fairness, particularly with respect to foreign corporations. And of course, for non-U.S. defendants, the due process inquiry is particularly sensitive, and the Supreme Court has taught that again and again. So if we are in 4K2 land, or if a case is in 4K2 land, even under a regime in which the Fifth Amendment analysis mimics the 14th, it will be somewhat more generous, right? Because if you're in 4K2 land, then you won't need to show minimum contacts with a particular state, just with the country as a whole. I think that's right, Your Honor. It has to be under the terms of the rule, because the relevant jurisdiction with which to show contacts under 4K2 is the United States as a whole, rather than Florida or California. But the test is the same. And so here, I suppose their theory is that a mine in Alaska and a mine in Washington, which they say are essentially enough to support jurisdiction, along with some trademark registrations and the maintenance of public securities on the New York Stock Exchange, they're saying, in effect, one isn't enough. So Washington won't do, and Alaska won't do. But the two together somehow count for enough contact with the United States for an assertion of general jurisdiction. But that's not the test. And in a post-Daimler case that's particularly important here, in Burlington Northern, Burlington Northern had extensive operations in Montana, hundreds of miles of track, hundreds of employees, significant revenues coming from that state. And yet the Supreme Court held that there was no general jurisdiction to adjudicate a claim. And that claim also arose under federal law. It was an FELA claim. And so it's not seriously contended here that the Daimler standard could be met. And so all of the jurisdictional discovery arguments that have been raised have to do with attempting to prove a pre-Daimler standard of personal jurisdiction. And Judge Scala was exactly right to reject that. And there was never an application for jurisdictional discovery. There were mentions in the briefing on the motion to dismiss of jurisdictional discovery without any explanation of what would be sought or how it would be relevant to the case. Eventually, a request for document production was served. And that but and following pages. And to look at that reveals how hollow the claims here are. Because every one of those document requests has to do with the supposed expropriation. I shouldn't say that. The Cuban government did expropriate these properties. Although it is in fact a fabrication that 100 million tons or any significant amount of ore was taken from those mines and trafficked. But that's not part of the record here. But all of the discovery sought had to do with the merits of a claim of expropriation, which is not at issue here. Not one of those document requests has anything to do with the question of personal jurisdiction. And I'll note that there is no claim in any of the three pleadings we have before us. The complaint, the first amended complaint, or the second amended complaint, arguing that any of these goods supposedly taken from the mines and supposedly trafficked were sold in the United States. You have a foreign corporation that acted in accordance with Cuban law and the policies of the Cuban government with respect to private property are reprehensible. But they are the policies of the Cuban government. And what is to property real or personal within a country's borders, owned by a national resident there, an expropriation under those laws does not constitute a wrong that can be redressed in the United States. And that is why the Helms-Burton Act, sweeping though it is, is restricted to takings from U.S. citizens. It's meant to protect the property of U.S. citizens in Cuba. And there have been challenges to that. And the statute has only been in effect for a while. And those will come eventually, I suppose. But as we describe at pages 29 through 31 of our brief, the language of the statute, as well as the logic of the statute, makes it very clear that it's restricted to takings from American citizens. And to do otherwise would have been to enact a statute in direct violation of a long-settled principle of international law. And it's, of course, a statutory construction canon that a U.S. statute should be construed if possible to conform to international law. And that leads me, Your Honors, to some of the substantive problems with this claim. The first of those claims is that Mr. Gomez-Cabrera was a Cuban national who owned these properties through a company he had organized under Cuban law called Minero-Ragoca. I hate to interrupt your flow, but before you get into the merits analysis, can I ask you one more question about the jurisdictional piece? Please. So I take your point to be that there is this body of law that regulates, that addresses extraterritorial regulation. That's the arbitrary and substantially unfair or whatever, fundamentally unfair standard. And then there's this body of law that addresses adjudication. And that's typical minimum contacts under the 4K2. Is there a reason that those two bodies of law exist separately? Is there a reason that the standard for extraterritorial regulation and adjudication under a statute that regulates extraterritorially should be different? I think so, Your Honor. The fact that Congress may, in general, seek to regulate conduct outside the United States that Congress has determined could affect the United States, the interests of the United States or conduct or citizens of the United States is one thing. But if I could be colloquial for a minute, the question is, can we catch them? So that I can think of any number of statutes like that. RICO, for example, applies extraterritorially. But this court in Panama versus BCCI didn't say, well, since RICO applies overseas, we have the power to reach out and haul in everyone who may have violated RICO in another jurisdiction. And that's also the logic of their decision, because they claim that there is some sweeping effects of the Helms-Burton Act that in effect would subject anyone who violates its terms overseas to personal jurisdiction in the United States. So that if, as here, you have a Canadian company operating in Cuba in conformity with Cuban law and selling goods that supposedly constitute trafficking in France, that that company is to the full machinery of federal justice. And that just cannot be the law, because it would be so fundamentally unfair and so disruptive of the international legal order. In my remaining time, Your Honor, I'd like to turn briefly to the merits, as I indicated when Mr. Gomez Cabrera died a Cuban national in Cuba. The Cuban government, in accordance with Cuban law, and say free though it is, had seized his property. It was nothing in his estate to pass on, putting to one side the fact that he was attempting to pierce his own corporate veil. And so decades later, my client was sued by an LLC, or actually a supposed LLC, because it didn't even exist at the time this case was brought. It was only in September of that year, after we had pointed out this failure, that the company was actually registered. But that company acquired its rights after 1996, and that is an absolute jurisdictional prerequisite under the statute. An assignment after 1996 cannot give standing to the assignee. And that was what was claimed to have happened here, that the unidentified heirs of Mr. Gomez Cabrera had assigned, in the words of the complaint, I believe it's paragraph 11, all right title and interest to this entity, Herederos de Roberto Gomez Cabrera. But that is fatal to the claim. And so in the proposed amended complaint, and I see my time is just about to expire, they switched ground and said, now all right title and interest was held by a group of individuals who are not this time said to be the heirs, but they are said to hold all right title and interest. Presumably they're either the heirs or the heirs of the heirs. But this all came after dismissal, on a motion for reconsideration, asking to join parties. Judge Scola did not abuse his discretion by not motion to amend. We respectfully ask that Judge Scola's well-reasoned opinion and his order be affirmed in all respects by this court. Thank you, your honors. Thank you so much, Mr. Herzl. You've got five minutes of rebuttal time remaining. Your honors, Congress found that tech should be held accountable in the United States courts for trafficking in property that was confiscated by the Cuban government. If we apply the minimum context test to the Helms-Burton Act, it's going to render the statute, using a phrase that I've heard Judge Newsom use, a dead letter law. That's what would be left of the Helms-Burton Act if we applied the minimum context analysis. And the reason why is because of, number one, the economic embargo that has existed for decades, where U.S. companies and individuals are not allowed to do business in Cuba, except for very minor exceptions like the travel industry, for example. But almost all traffickers in every other industry in Cuba for which property was taken by the Cuban government, those are all foreigners. And the statute expressly covers foreign investors that are doing joint ventures with the Cuban government to profit off of property that was confiscated by the Cuban government. Let me ask you a question going back to a question I asked Mr. Sills. So I asked him, does it make sense that we would have one test for what I'll call regulation, extraterritorial regulation, a different test for adjudication arising under statutes that have extraterritorial effect? He says, yeah, it does make sense because it's one thing for us to say Congress can regulate conduct overseas. It's an entirely different thing for us to say, oh, by the way, in the course of regulation, every defendant who gets sort of like caught up in the trap or whatever can be hailed into court in the U.S. I think in your opening brief, when the portion of Oldfield was quoted to you about where we came right up to the line of saying the Fifth Amendment analysis should track the 14th because the language is the same, you said, yeah, but that doesn't hold for statutes that regulate extraterritorially. And I think what he just said is not true because in the BCCI case, we were talking about RICO, which does apply extraterritorially. And yet the court there said, we're going to do traditional minimum contacts analysis. Have I like missed something in the conversation or is there a nuance? I think the nuance is that the RICO statute does not apply extraterritorially. And the RJR Nabisco case. And that's why the Supreme Court in that case applied the minimum contacts analysis to the defendant. But there's not a single case where the minimum contacts analysis has been applied under a Fifth Amendment due process question where the statute expressly regulates extraterritorially. Not a single case where that happens. And the precedent in this extraterritorial statute, you apply the not arbitrary or fundamentally unfair standard. In this case, under 4K2, even if we were to apply minimum contacts, there's both general and specific jurisdiction. The specific jurisdiction analysis is somewhat conflated with the analysis that I asked this court to adopt based on U.S. versus Napa and U.S. expressly left open the possibility of a different analysis under the minimum contacts. But under specific jurisdiction, the effects test is whether or not the conduct overseas had a substantial effect in the United States. And it's not just because the plaintiff is in the United States. It has to be something that is affecting the forum itself. In this case, the forum is the United States. So the trafficking and property that was confiscated by the Cuban effect in the United States. And when they're trafficking in that property, knowing that there's a statute in the United States that would you spell out more specifically what the impact domestically would be of what you're just talking about. You're suggesting to us that it has an impact. It has an effect here. Tell me what the effect is. Congress has recognized in section 6081 of the Helms-Burton Act, all throughout the congressional record, that Cuba has been engaged in terrorist activities, that they're tyrants, that they're trampling on property rights of United States nationals. Just before the Helms-Burton Act was passed, weeks before, the Castro government shot down two unarmed civilian aircrafts of the United States. They're called Brothers to the Rescue aircrafts. And that's what prompted the passing of the Helms-Burton Act, because trafficking and confiscated property is financially aiding the Cuban government. And Congress found that this Helms-Burton Act is going to hit them where it hurts the most, their pocket, to protect national security, to protect US foreign policy, and to protect US nationals. That's the basis for which Congress has regulated here. I see that my time is now up. Okay, very well. Thank you both. Well argued on both sides. That case is submitted and the court will stand in recess until tomorrow.